IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **BILLY JOHN GALLOWAY** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **VS.** | § | |
| | § | **NO. 3:04-CV-234-G** |
| **NATHANIEL QUARTERMAN, Director,** | § | |
| **Texas Department of Criminal** | § | |
| **Justice, Correctional Institutions** | § | |
| **Division** | § | |
| | § | |
| **Respondent.** | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

This cause of action was referred to the United States Magistrate Judge pursuant to the

provisions of Title 28, United States Code, Section 636 (b), implemented by an order of the United

States District Court for the Northern District of Texas. The Findings, Conclusions, and

Recommendation of the United States Magistrate Judge follow:

**FINDINGS AND CONCLUSIONS**

**I.      NATURE OF THE CASE**

A state prison inmate has filed a petition for writ of habeas corpus pursuant to Title 28,

United States Code, Section 2254.

**II.      PARTIES**

Petitioner, Billy John Galloway, is an inmate in the custody of the Texas Department of

Criminal Justice, Correctional Institutions Division (TDCJ-ID). Respondent is the Director of

TDCJ-ID.

## III. PROCEDURAL HISTORY

A jury convicted Petitioner of capital murder, and his punishment was assessed at death by lethal injection. *State v. Galloway*, No. 19,882 (354th Dist. Ct. Hunt County, Tex. Mar. 24, 2000). Petitioner appealed to the Texas Court of Criminal Appeals, which affirmed the conviction and death sentence in an unpublished opinion. *Galloway v. State*, No. 73,766 (Tex. Crim. App. Jan. 29, 2003). Petitioner filed a state application for writ of habeas corpus on October 22, 2001. The Court of Criminal Appeals denied relief in an unpublished order. *Ex parte Galloway*, No. 56,856-01 (Tex. Crim. App. Jan. 21, 2004).

Petitioner filed his federal petition for writ of habeas corpus on January 20, 2005, Respondent filed an answer on March 25, 2005, and furnished the state court records, and Petitioner filed a reply on April 28, 2005. On May 30, 2007, this Court issued an order granting limited discovery and giving Petitioner leave to depose Petitioner's trial attorneys. These depositions, along with the depositions of two legal assistants who worked on the case, were filed with the Court on October 5, 2007. On November 7, 2007, Petitioner filed a supplemental brief, on December 5, 2007, Respondent filed a response, and on December 17, 2007, Petitioner filed a reply brief.

## IV. RULE 5 STATEMENT

Respondent asserts that Petitioner has failed to exhaust the ground for relief he raises in his federal petition because one of his legal theories and its supporting evidence were not presented to the state court. Accordingly, Respondent asserts that this portion of the claim is procedurally barred.

Nonetheless, Respondent asserts that this claim is also without merit and may be denied on its merits pursuant to 28 U.S.C. § 2254(b)(2).[1].

## V.  ISSUE

Petitioner contends that his Sixth Amendment right to effective assistance of counsel was violated because his trial attorneys failed to investigate, develop, and present mitigation evidence at the punishment phase of his trial.

## VI.  STANDARD OF REVIEW

The pertinent terms of the Antiterrorism and Effective Death Penalty Act of 1996 (the AEDPA), 28 U.S.C. § 2254, provide:

> (d)     An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
>> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in a State court proceeding.

28 U.S.C. § 2254(d) (2000).

Section 2254(d)(1) concerns pure questions of law as well as mixed questions of law and fact.  *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir.), *cert. denied*, 534 U.S. 885 (2001).  Under the "contrary to" clause, a federal habeas court may grant the writ of habeas corpus if the state court arrives at a conclusion opposite to that reached by the United States Supreme Court on a question

---

[1]

An application for a writ of habeas corpus may be denied on its merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State. 28 U.S.C. § 2254(b)(2).

of law or if the state court decides a case differently from the United States Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). With respect to the "unreasonable application" clause, a federal court may grant a writ of habeas corpus if the state court identifies the correct governing legal principle from the United States Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *Williams*, 529 U.S. at 413. Under *Williams*, a state court unreasonably applies Supreme Court precedent if it "unreasonably extends a legal precedent from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407.

Section 2254(d)(2) concerns questions of fact. *Moore v. Johnson*, 225 F.3d 495 (5th Cir. 2000), *cert. denied*, 532 U.S. 949 (2001). Under § 2254(d)(2), federal courts "give deference to the state court's findings unless they were "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir.) (as modified on denial of rehearing), *cert. denied*, 531 U.S. 1002 (2000). The resolution of factual issues by the state court is presumptively correct and will not be disturbed unless the state prisoner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

This statute applies to all federal habeas corpus petitions which, as with the instant case, were filed after April 24, 1996, provided that they were adjudicated on the merits in state court. *Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Resolution on the merits in the habeas corpus context is a term of art that refers to the state court's disposition of the case on substantive rather than procedural grounds. *Green v. Johnson*, 116 F.3d 1115, 1121 (5th Cir. 1997).

## VII. FACTUAL BACKGROUND

The Texas Court of Criminal Appeals recited the following factual background in its opinion

on direct appeal:

> During the late summer of 1998, appellant, his girlfriend, Deannee Bayless, appellant's friend Kevin Varga, and Varga's girlfriend, Venus Joy Anderson, were all on probation or parole with the South Dakota Department of Corrections. On September 1, 1998, the four gathered their money and belongings, loaded up appellant's automobile, and left South Dakota.

> A few days later, the group arrived in Wichita, Kansas, and checked into a hotel. That evening, after discussing a plan to lure someone back to the hotel to blackmail or rob them, appellant, Anderson, and Bayless went to a bar. At the bar, the three met David McCoy, and Bayless talked him into returning to the hotel with them. Once there, the men killed McCoy, wrapped his body in a blanket, and loaded it into appellant's vehicle. Driving both appellant's vehicle and McCoy's car, the group headed out of Wichita. After appellant's automobile stopped running, they abandoned it in a parking lot with McCoy's body still inside.

> The group arrived in Greenville, Hunt County, Texas, September 7, 1998. Appellant and Varga wanted more money, so they agreed to engage in the same pickup scheme that they had used in Kansas. Shortly thereafter, Bayless and Anderson met David Logie at the Holiday Inn and convinced him to go eat with them. With Bayless driving Logie's rental car, the three left the Holiday Inn parking lot. Appellant and Varga surreptitiously followed them in McCoy's car. Shortly thereafter, Bayless pulled off the road near a building. Bayless got out of the car with Logie and told Anderson that she and Logie were going to have sex on the hood of his car. About this time, appellant appeared and began cursing and hitting Logie with his fist, knocking him down. Varga repeatedly struck Logie with a log, killing him. Bayless took Logie's wallet and credit cards. The group burned McCoy's vehicle and left Greenville in Logie's rental car.

> The group traveled to San Antonio, where Bayless and Anderson used the credit cards Bayless had stolen from Logie at a local mall. As they were leaving the mall parking lot, the women noticed a police car behind them, and they pulled into a nearby Wal-Mart parking lot. The officer approached and separated the two women. After Anderson confessed to the murders, officers arrested Bayless and

Anderson. Appellant and Varga were arrested later that night. Based on the information Anderson gave in her confession, the authorities located Logie's body near Greenville and notified Kansas authorities about McCoy's murder.

*Galloway*, slip op. at 2-3 (footnotes omitted).

## VIII. PROCEDURAL ISSUE

Respondent asserts that Petitioner is procedurally barred from presenting a portion of his claim of ineffective assistance of counsel because it was not exhausted at the state level. Specifically, in both its initial response and in its post-discovery response brief, Respondent asserts that Petitioner failed to argue the same legal theory at the state level as he does here at the federal level and failed to present the factual evidence he has submitted to this Court to the state habeas court. In particular, Respondent asserts that, at the state habeas level, Petitioner argued that his trial counsel were ineffective for failing to present certain mitigating evidence, but now at the federal level also argues that trial counsel were ineffective for failing to further investigate mitigating evidence. Furthermore, Respondent contends that Petitioner's claim is unexhausted because additional evidence in support of the claim has been presented to this Court that was not presented at the state level. Respondent further contends that Petitioner is procedurally barred from raising his new legal theory and utilizing additional factual support for his claim because, were Petitioner to return to state court in an attempt to exhaust his claim, the state court to which he would be required to petition would now find that the claim is procedurally defaulted. *See Bledsue v. Johnson*, 188 F.3d 250, 254 (5th Cir. 1999).

In his initial reply brief, Petitioner argues that his claim is not procedurally barred for failure to exhaust because the state habeas court never ordered an evidentiary hearing to consider evidence supporting the claim and the evidence submitted to this Court does not fundamentally alter the

claim. (Reply at 13-20). However, after all the pleadings were filed in this case, Petitioner filed a motion entitled "Motion to Stay Proceedings and Hold Them In Abeyance." In this motion, Petitioner apparently conceded that he did not exhaust his legal theory of ineffective assistance of trial counsel for their failure to conduct an adequate investigation into mitigating evidence. Petitioner then requested that this Court stay and abate this proceeding in order to allow him to return to state court and present the unexhausted portion of his claim. In this motion, Petitioner acknowledged that Article 11.071 § 5 of the Texas Code of Criminal Procedure prohibits a claim from being raised in a subsequent habeas application unless: 1) it could not have been raised in the previous application because the factual or legal basis was unavailable at the time; or 2) the claim contains sufficient facts establishing that, but for a violation of the United States Constitution, no rational juror would have found petitioner guilty or would have answered the punishment issues in the State's favor. *See* TEX. CODE CRIM. PROC. ANN. art 11.071 § 5(a) (Vernon Supp. 1999). Nevertheless, Petitioner cited recent cases from the Court of Criminal Appeals as support for his assertion that, notwithstanding this statutory procedural hurdle, the Court of Criminal Appeals might allow Petitioner to file a subsequent habeas petitioner raising his new legal theory. Respondent filed a response to this motion, arguing that, among other things, Petitioner's case should not be stayed and abated because he has not shown that his ineffective assistance claim has merit and because he has not shown good cause for such an action.

The Supreme Court has held that, in order for a federal habeas claim to be considered exhausted at the state level, a state prisoner is required to present the same constitutional claim to the state court as he presents to the federal courts. *See Picard v. Connor*, 404 U.S. 270, 276-77 (1971). Furthermore, a claim is unexhausted if a petitioner presents "material additional evidentiary

support" for the claim to the federal court. *See Graham v. Johnson*, 94 F.3d 958, 968 (5th Cir. 1996). However, the Fifth Circuit has also held that additional evidentiary support for a claim first presented to a federal court does not render a claim unexhausted if the new evidence "supplements" and does not "fundamentally alter" the claim presented to the state court. *See Anderson v. Johnson*, 338 F.3d 382 (5th Cir. 2003).

At the state habeas level, Petitioner argued that his trial counsel were constitutionally ineffective because they failed to present mitigating evidence at trial, including Petitioner's psychiatric and psychological history, specifically, his prior diagnoses of alcohol and chemical dependence; his explosive antisocial personality and organic mood disorders; and his positive work experience. State habeas counsel pointed to two state exhibits, one from the South Dakota prison system which contained Petitioner's criminal history and prior psychological and psychiatric examinations and one from a South Dakota halfway house that contained some of his work history. State habeas counsel faulted trial counsel for failing to elaborate on material contained in these documents and for failing to offer psychiatric evidence at trial. (State Habeas Transcript ("SHTr."): 6-9). At the federal level, Petitioner alleges that his trial counsel were constitutionally ineffective for failing to investigate, develop, and present evidence of mitigation, including evidence that was both known and unknown to counsel at the time. (Petition at 26, 30). Furthermore, at the state habeas level, the only additional factual support for the claim was an affidavit from Dennis Davis, one of Petitioner's trial attorneys, but signed by both Dennis Davis and his co-counsel, Jerry Davis. (Supp. State Habeas Transcript ("Supp. SHTr."): 6). Here, Petitioner has also submitted affidavits from a mitigation specialist, a psychologist, and his birth mother and stepmother. In addition,

transcripts of depositions of Petitioner's trial counsel, Jerry Davis and Dennis Davis, as well as two of their employees, have been submitted to this Court.

This Court need not decide whether Petitioner's entire claim is exhausted or whether Petitioner might be able to return to state court to pursue this claim, however, because under 28 U.S.C. § 2254(b)(2), a federal petition for a writ of habeas corpus may be denied on its merits, notwithstanding the petitioner's failure to exhaust state court remedies. *See* 28 U.S.C. § 2254(b)(2). Because this Court has determined that Petitioner's entire ground for relief is without merit, even considering the new evidence submitted to this Court, this Court declines to find Petitioner's claim procedurally barred and will address the claim on its merits.[2]

## IX.    EXAMINATION OF THE GROUND FOR RELIEF

Petitioner's sole ground for relief is that his trial counsel provided ineffective assistance of counsel because they failed to investigate, develop, and present mitigating evidence at the punishment phase of his trial.  Specifically, Petitioner asserts that trial counsel possessed ample knowledge of mitigating evidence that could have, and should have, been presented at trial.  In particular, Petitioner points out that his attorneys had access to records from Glory House, a halfway house where Petitioner had lived, and Petitioner's medical records from his hospitalization for a car wreck.  Counsel had interviewed the director of the prison in which Petitioner had been housed in South Dakota and had hired a psychologist to examine Petitioner.  Petitioner also asserts that trial counsel were ineffective for failing to further investigate potential mitigating evidence.  Petitioner

---

[2]  Because this Court will address Petitioner's claim in its entirety, it is unnecessary for Petitioner to return to state court to exhaust his claim.  Furthermore, it is unnecessary for this Court to determine whether new case law from the Texas Court of Criminal Appeals evidences a willingness to consider a claim that that court would have previously considered procedurally barred.  Accordingly, this Court denied Petitioner's motion to stay and abate in a separate order.

alleges that if trial counsel had further investigated his childhood, they would have uncovered a history of neglect and physical and sexual abuse that was available and should have been presented at the punishment phase of his trial. Petitioner further contends that if this evidence had been presented, there is a reasonable probability that he would not have been sentenced to death.

Respondent argues that trial counsel were not ineffective for failing to investigate or present mitigating evidence at Petitioner's trial because either: 1) Petitioner specifically instructed them not to present this evidence; or 2) counsel made a strategic decision not to present this evidence. Respondent also argues that Petitioner has failed to establish a reasonable probability that, were this evidence presented, he would not have been sentenced to death.

**Applicable Facts**

*Evidence Presented at Trial*

At the punishment phase of Petitioner's trial, the State first presented testimony from a relative of each of the two victims. Then, through the testimony of numerous Texas police and corrections officers, the State presented evidence of Petitioner's escape from the Hunt County Jail. Petitioner had been awaiting trial and escaped by threatening a female guard with a homemade knife. Additionally, the testimony showed that, after Petitioner was taken into custody following the escape, authorities found a metal object hidden in Petitioner's cell and also found books and cassette tapes which reflected his interest in death and the occult. (R. 44:48-185, 45:14-41). Through the testimony of South Dakota police officers, the State also presented evidence that Petitioner led Sioux Falls police on a car chase in 1996 after police officers attempted to execute a traffic stop. This chase resulted in a car crash in which Petitioner was injured after his car struck a tree. He was later charged with driving while intoxicated and possession of a controlled substance.

(R. 45:75-84). The State further presented evidence that Petitioner had been arrested in South Dakota for resisting arrest, causing disturbances, possession of a concealed weapon, and for repeatedly threatening police officers. (R. 45:72-117). Finally, the State placed into evidence Petitioner's South Dakota prison records. The State also attempted to introduce records from Petitioner's stay at the South Dakota halfway house but the court sustained counsel's objection and the records were not admitted into evidence. (R. 45:150-53).

*Evidence Presented to the State Habeas Court*

The state habeas court initially issued findings of fact and conclusions of law on August 7, 2003, recommending that relief be denied. On October 22, 2003, the Court of Criminal Appeals ordered that the transcript be supplemented with an affidavit from trial counsel, explaining why counsel chose not to present mitigating evidence at trial. *See Ex Parte Galloway*, No. 56,856-01 (Tex. Crim. App. Oct. 22, 2003). On December 17, 2003, the trial court submitted a supplemental transcript to the Court of Criminal Appeals containing an affidavit. In the typed body of the affidavit, the signer is identified as Dennis Davis, but the affidavit is signed by both trial attorneys, Dennis and Jerry Davis. (Supp. SHTr.:6-7). Based on this affidavit, the Court of Criminal Appeals found that the decision not to present mitigating evidence was reasoned trial strategy and denied relief. *See Ex Parte Galloway*, No. 56,856-01 (Tex. Crim. App. Jan. 21, 2004).

This affidavit states that in the early stages of the case, counsel discussed whether to present mitigating evidence because they were aware of Petitioner's troubled history. The defense hired a psychologist to evaluate Petitioner. Counsel advised Petitioner of the importance of the examination and requested that he cooperate. Dr. Alan Hopewell interviewed Petitioner, but reported to counsel that Petitioner did not complete the examination and answered only a minimal amount of questions,

indicating that he had not cooperated.  Dr. Hopewell indicated that Petitioner might be in the low

average to borderline intellectual functioning range but could provide no further diagnosis because

Petitioner was performing in an "immature" manner.  Defense counsel decided not to call Dr.

Hopewell as a witness because the psychological information was limited.  (Supp. SHTr.:6).

The affidavit also states that, while counsel were aware of allegations of child abuse,

Petitioner's father appeared to be the perpetrator.  Petitioner remained loyal to his father and refused

to allow counsel to introduce any evidence that would disparage his father.  Counsel opted not to

present evidence of Petitioner's previous diagnosis of a substance abuse disorder.  Counsel also

opted not to present evidence from the director of the South Dakota prison that while Petitioner was

housed there, he had thirty-nine minor infractions but was not much of a problem.  Counsel

determined that this information would not assist them and instead decided not to present mitigating

evidence.  Instead, they argued to the trial court that Texas law only allowed the State to present

victim impact evidence if mitigation evidence is offered at trial. (Supp. SHTr.:6-7).  The state habeas

transcript also includes a July 9, 2003 letter to Judge Richard Beacom from state habeas counsel,

Mark Breding.  In this letter, Mr. Breding states that, because Petitioner did not wish to undergo a

current psychological evaluation in support of his state application, an evidentiary hearing did not

appear to be necessary. (SHTr.:127).

*Evidence Presented at the Federal Level*

<u>Affidavits and Declarations</u>

Petitioner presented affidavits to this Court from both his birth mother and his stepmother.

His birth mother, Mary Scott, avers that she was married for less than a year to Petitioner's father,

William Galloway, and that he physically, emotionally, and verbally abused her.  Specifically, she

states that on three occasions, he beat her so badly that she almost died. On her wedding day, she had two black eyes. She also remembers her husband hitting her and kicking her around the yard. She obtained several restraining orders against him. Petitioner witnessed much of this abuse, and Petitioner's father also threatened Petitioner and his younger brother. Ms. Scott also states in her affidavit that Petitioner was removed from her custody when he was three years old. She only saw him briefly when he was ten and again when he was seventeen. They became reacquainted and began corresponding when he was incarcerated for this crime. Finally, she states that she would have provided this information to the defense and testified at trial, if the defense had contacted her. (Pet'r Ex. J).

Petitioner's stepmother, Mary Galloway, avers that she has been married to Petitioner's father, William Galloway, for thirty years. Petitioner began living with them when he was three years old, after Child Protective Services removed him from his mother's care. Before they were awarded permanent custody, she observed bruises and sores on Petitioner. Petitioner was living on the street and in bars, had poor hygiene, and was left alone and unsupervised. Mrs. Galloway further states in her affidavit that Petitioner was not fitted for proper shoes for his club feet until he lived with them. Mrs. Galloway revealed that she left William for a period of time. During her absence, Petitioner lived with his father in Texas. When Mr. and Mrs. Galloway reunited several years later, she became the primary caretaker of Petitioner and his half-brother. Finally, Mrs. Galloway states in her affidavit that Petitioner was placed in a childrens' home by the school district when he was ten years old due to severe behavior problems. He ran away from there two years later and was sent to a boy's ranch where he was expelled due to alcohol consumption. Petitioner withdrew from school in the seventh grade and began a long history of substance abuse. Further, she states in her

affidavit that she and Petitioner's father did everything they could to help Petitioner, but his addiction was too strong. (Pet'r Ex. K).

Petitioner has also submitted to this Court a declaration by a mitigation specialist, a declaration by a psychologist, and what appears to be a portion of an interview with Petitioner conducted by the psychologist. The mitigation specialist, Shelli Schade, states in her declaration that she interviewed Petitioner several times and spoke to his father, stepmother, birth mother, brother, trial attorneys and their legal assistants, and one of his federal habeas attorneys. She also states that she reviewed numerous records, including Petitioner's South Dakota prison and parole records, Petitioner's school records, treatment records, children's services records, hospital records and records from Petitioner's stay in a halfway house. In her declaration, Ms. Schade recounts the information she obtained through these interviews and records, including the history of neglect and abuse in Petitioner's childhood, the history of alcohol and drug abuse in Petitioner's family, Petitioner's own history of violent and criminal activity and alcohol and drug abuse, Petitioner's poor school record and history of learning disabilities, and Petitioner's prior history of suicidal thoughts and diagnoses of personality disorders. Ms. Schade also states in her declaration that Petitioner's family suspects that Petitioner was molested by his foster parents' son while he was in foster care. She concluded that Petitioner had a "hard time" talking about it. According to Petitioner, years later he and his father were asked to leave Petitioner's aunt's house because she suspected that he had touched her young daughter inappropriately. Also in this declaration, Ms. Schade states that Petitioner informed her that he did not disclose his history to his trial attorneys because he was ashamed and embarrassed about his upbringing, but he probably would have told

them more and allowed them to present the evidence if they had spent more time with him. (Pet'r Ex. H).

Daneen Milam, Ph. D. ("Dr. Milam"), states in her declaration that she both reviewed Petitioner's records and performed a neuropsychological examination on Petitioner. As part of the formal testing, she spent ten hours with Petitioner over a two-day period, during which Petitioner took numerous achievement and personality tests. Based on his history and these tests, Dr. Milam diagnosed Petitioner as having had an attention disorder as a child. Dr. Milam determined that because of his impoverished childhood, child abuse, substance abuse, and head injury from a car crash, this childhood disorder developed into a bipolar disorder. This mood disorder responds well to a structured environment such as prison. (Pet. Ex. I). The interviewer noted that Petitioner has an "Aryan Pride" tattoo on his neck, numerous skull tattoos over his body, a demon tattoo on his neck, a big dragon tattoo on his side, and two tombstone tattoos. In the interview, Petitioner related some of his history, including the time he hit his aunt in the head with a baseball bat, the fact that he disliked his stepmother, the succession of schools from which he was expelled, his history of drug and alcohol abuse, his expulsion from a detoxification center, and some of his criminal history. (Pet'r Ex. L).

### Depositions

In his deposition, lead trial counsel Jerry Davis testified that he had a very good, friendly relationship with Petitioner. He further stated that Petitioner did not want any psychiatric or psychological testimony offered as mitigating evidence, did not want to bring up anything that would embarrass his family, and would not accept the life sentence that the State offered him. (JD Depo.: 5,7). Specifically, Jerry Davis testified that Petitioner rejected an offer of a life sentence by

the State a few weeks after Davis was appointed because he did not want to spend his life in a Texas prison. He stated that he would rather die than spend the rest of his life in a Texas prison. Petitioner was willing to consider a life sentence in a Kansas penitentiary, but the Kansas officials declined. Both Jerry Davis and his two legal assistants continually urged Petitioner to accept this offer from the State, but he refused. (JD Depo.:24-8, 57, 69). Jerry Davis believed that the evidence offered by the State at punishment strongly showed that Petitioner would be a future danger due to the fact that he escaped from jail by holding a homemade shank to a female jailer's throat. (JD Depo.:16). Therefore, the defense needed to present mitigating evidence, and Jerry Davis was aware of the abuse allegations and Petitioner's history of substance abuse because he had reviewed the South Dakota prison records and the Glory House halfway house records. (JD Depo.:29-32, 67). However, Petitioner refused to discuss his abusive background with Jerry Davis and said it was because he did not want to embarrass his family. Petitioner stated to his attorneys that he liked them, and they should do what they could for him although he would not accept a life sentence and did not want any "excuses" brought up such as psychiatric or psychological testimony or evidence of his childhood. (JD Depo.:28). As a general matter, Jerry Davis does not believe substance abuse to be mitigating evidence and finds such evidence to be ineffective before a jury, so was not inclined to present such evidence at trial. (JR Depo.:33-4). Jerry Davis further testified that he chose not to go against Petitioner's wishes and present mitigating evidence at trial because he feared that Petitioner would become enraged and might physically harm him. Davis further explained that, although Petitioner was never aggressive with him, Petitioner was an absolutist who was already agitated about a continual problem he had with one of the sheriff's deputies and had to be calmed down before he appeared at trial. (JD Depo.:37-41). Davis further testified that although he did not

recall successfully objecting to the admission of the halfway house records into evidence at trial, the objection would have been consistent with Petitioner's desire not to have this type of evidence admitted. (JD Depo.:49-50). Davis also testified that Petitioner would not permit his defense attorneys to try to place the primary blame on his co-defendant, Kevin Varga, because they were "buddies." (JD Depo.:51-2). Furthermore, Petitioner's father, who was a long-haul truck driver, indicated that he would try to attend the trial, and defense counsel had the impression that Petitioner was so proud and happy that he had his father's support that he did not want to do anything to harm that relationship. (JD Depo.:60, 65). Finally, Jerry Davis testified in his deposition that he and his co-counsel, Dennis Davis, agreed to abide by their client's wishes in order to have an orderly trial. (JD Depo.:59).

In his deposition, co-counsel Dennis Davis testified that he believed that he had a good relationship with Petitioner. After he and Jerry Davis were appointed as Petitioner's counsel, he visited Petitioner at jail almost every Sunday, and other days as well. (DD Depo.:7). He vouched for Petitioner's behavior, urging that Petitioner need not be shackled in the courtroom. (DD Depo.:8-9). Petitioner opened up to Dennis Davis and revealed his upbringing and life before the offense, as well as facts surroundings the offense itself. (DD Depo.:10-11). Therefore, Dennis Davis knew about Petitioner's bad upbringing but also knew that Petitioner was protective of his father and did not want him placed in a bad light. (DD Depo.:12-3). Dennis Davis stated that Petitioner did not accept the offer of a life sentence from the State because he could not serve it in Kansas and because he viewed a life sentence in Texas and a death sentence as the same. (DD Depo.:14-5).

Dennis Davis contacted Dr. Hopewell and requested that he examine Petitioner. Before Dr. Hopewell visited Petitioner, Dennis Davis stressed to him the importance of the testing. Nevertheless, Dr. Hopewell informed Dennis Davis later that Petitioner stopped taking the tests and that the only thing Hopewell could tell from his limited answers was that Petitioner acted in an immature manner. (DD Depo.:23-7). Trial counsel decided not to put Dr. Hopewell on the stand with this limited information because if they did, Texas law would have required them to allow Petitioner to be examined by a State expert. (DD Depo.:27-8).

Dennis Davis further testified that he reviewed some of Petitioner's records from South Dakota and spoke to a director of prisons in South Dakota. Dennis Davis and the defense investigator spoke with Petitioner's father, as well. Also, the defense investigator spoke with Petitioner's stepmother by cell phone because Petitioner believed that she was blocking his calls to his father from jail. Dennis Davis did not speak to Petitioner's birth mother and does not remember Petitioner telling him about any sexual abuse from his past. (DD Depo.:30-1). Dennis Davis was aware that Petitioner's father physically abused him. Petitioner told someone on the defense team that his father once jabbed him in the eye with a pencil. (DD Depo:32). Dennis Davis was interested in calling the director of prisons as a witness because she had stated that Kevin Varga, Petitioner's co-defendant, was a bad influence on Petitioner. He remembered that the director was reluctant to come, but he did not recall why the decision was made not to call her as a witness. (DD Depo.:38-42, 66). Dennis Davis' recollection of the reason that mitigating evidence was not presented at trial is vague, but he recalled that Petitioner did not want certain things placed into evidence, such as any evidence critical of his father or of his co-defendants. He knew that the defense team would lose Petitioner's cooperation if they went against his wishes. (DD Depo.:47-

18

54). Dennis Davis does not recall that Petitioner instructed the defense not to present any mitigating evidence at trial. (DD Depo.:61).

Paula Malacek, the senior legal assistant and office manager for Jerry Davis testified in her deposition that previously, she worked as a substance abuse counselor for adolescents and juveniles. She testified that she communicated with Petitioner extensively before trial and sat next to him at trial. (PM Depo.:5, 14). She estimated that she spent at least ten hours a week on the telephone with Petitioner or speaking to him in person. She promised him that she would never lie to him if he promised not to take an aggressive action against their staff or anyone else in the jail. The defense worked not to have the trial judge shackle Petitioner during the trial based upon his previous violent jail escape. Malacek testified that she viewed her role as trying to get Petitioner to open up so that the defense could show him in a human light. (PM Depo.:6-10). The defense knew about his history of abuse from some of his past records, but she tried to learn the specifics from Petitioner. Petitioner did not want to present any evidence of his upbringing because he was ashamed and embarrassed about it and believed that it made him appear weak. (PM Depo.:11, 17). Petitioner went so far as to tell Malacek that he would stop communicating with her if she repeated to anyone else what he had told her. In particular, Petitioner would not allow anyone to say anything bad about his father or mother. (PM Depo.:17-8). Petitioner also did not want the defense speaking to his stepmother. He said that they had a difficult past and that she might be blocking some of his calls to his father. Petitioner told Malacek that he did not want the defense to call any members of his family as witnesses because he did not want to look like a "punk" in court. (PM Depo.:21-4). Most of the time, Petitioner would not tell Malacek specifics about his childhood but rather, would speak in generalities. He did relate that his father had stuck him in the eye with a pencil, but he refused

to talk further about his father in a negative way. (PM Depo.:26-7). The defense did not contact his birth mother because Petitioner had not seen her since he was a small child. (PM Depo.:22).

Malacek further testified that Petitioner was offered a life sentence but, because he could not serve it in Kansas, he was unwilling to accept the offer. According to Petitioner, he viewed a life sentence in Texas with the tattoos he had covering his body (involving white supremacy and satanic insinuation) as being the equivalent of a death sentence. (PM Depo.:11-13). Malacek is personally against the death penalty. She was very upset during the punishment phase of the trial because she suspected that, with the little Petitioner would allow the defense to do for him, the death penalty would be the result. (PM Depo.:31-2, 34-5). Malacek also testified that the defense team did not believe that Petitioner's history of substance abuse would be considered mitigating evidence in Hunt County. Therefore, they did not consider trying to present that type of evidence at the punishment phase. (PM Depo.:35-6). There was no discussion within the defense team of going against Petitioner's wishes, and Malacek feels that, if they had, he would have probably thrown a fit in the courtroom. (PM Depo.:37-8). Petitioner took pride in not having excuses for his crimes and took pleasure in the fact that Varga "punked out" by telling his attorneys about the abuse he had been subjected to by his mother but Petitioner did not. (PM Depo.:41, 44).

Jennifer Grady testified at her deposition that she is a legal assistant for Jerry Davis and that, in preparation for Petitioner's trial, she spoke with Petitioner by telephone every day in an attempt to keep him calm because he had several disagreements in the jail. She also attempted, unsuccessfully, to get him to accept an offer of a life sentence, but he stated to her that he would rather die than spend his life in prison. She did not discuss his background with him other than the

fact that he mentioned he had a drug problem. He also told her that he would rather accept the blame for the crimes rather than involve his co-defendants. (JG Depo.:4-10).

**Applicable Law**

The Sixth Amendment to the United States Constitution guarantees a defendant in a criminal case reasonably effective assistance of counsel. *Cuyler v. Sullivan,* 446 U.S. 335, 344-45 (1980). In order to obtain federal habeas relief due to ineffective assistance of counsel, a petitioner must satisfy the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984). Under the *Strickland* test, in order to prove that his counsel was ineffective, a defendant must prove by a preponderance of the evidence both that counsel's performance was deficient and that this deficient performance prejudiced his defense. *Id*. at 687. Courts, however, should "indulge a strong presumption" that counsel's conduct falls within the range of reasonable assistance, and a defendant must overcome the presumption that an action is sound trial strategy. *Id.* at 689. To establish prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. In the context of ineffective assistance of trial counsel, the prejudice component of the *Strickland* test "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Williams*, 529 U.S. at 393 n.17 (citations and internal quotation marks omitted). Reviewing courts must consider the totality of the evidence before the finder of fact in assessing whether the result would likely have been different absent the alleged errors of counsel. *Strickland*, 466 U.S. at 695-96. The Court also noted in *Strickland* that a fair assessment of an attorney's performance requires one "to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.

In *Wiggins v. Smith*, 539 U.S. 510 (2003), and *Rompilla v. Beard*, 545 U.S. 374 (2005), the Supreme Court applied the *Strickland* standard in cases where the claim was made that counsel was ineffective by failing to investigate, and then present, potentially mitigating evidence. The Court in *Wiggins* determined that the appropriate question was whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background was a reasonable decision. *Id.* at 522-23. Under the *Strickland* standard, a determination must be made regarding whether trial counsel used "reasonable professional judgment" to support a limited investigation into potential mitigation evidence. *Id.* This analysis is done by conducting an objective review of counsel's performance under the prevailing professional norms, in the context of counsel's perspective at the time of trial. *Id.* In *Wiggins*, the Court determined that trial counsel were ineffective for failing to investigate potential mitigating evidence beyond a series of tests conducted on Wiggins by a psychologist, a written presentence investigation report, and records from the Department of Social Services (DSS). *Id.* at 523-24. Furthermore, the Court held that Wiggins had been prejudiced by this failure because, had counsel had a social history report prepared and/or followed up on the information contained in the DSS records, counsel would have uncovered and been able to present evidence that Wiggins suffered from severe deprivation and abuse at the hands of an alcoholic mother and physical and sexual abuse during subsequent foster care, and that there was a reasonable probability that the jury, confronted with this evidence, would have returned a different verdict at sentencing. *Id.* at 524-25, 534-36.

Then, in *Rompilla*, the Supreme Court held that trial counsel were ineffective for failing to examine the court's file about a prior conviction Rompilla received for rape and assault because defense counsel was on notice that the State intended to present evidence of this prior conviction in

its attempt to seek the death penalty against Rompilla. *Rompilla*, 545 U.S. at 383. The Supreme Court then held that, had counsel viewed this court file, counsel would have discovered "mitigation leads" from the prison files, which indicated that Rompilla's history was very different from what Rompilla and his family had told trial counsel, including evidence of a childhood in a slum environment, a history of alcohol abuse, and previous psychological tests that pointed to schizophrenia and other disorders, as well as a low level of cognition. *Id*. at 390-91. Then, had counsel pursued these leads, counsel would have discovered that Rompilla's parents were severe alcoholics, their children were neglected, Rompilla was frequently physically abused by his father, and Rompilla suffered from organic brain damage and significantly impaired cognitive function. *Id*. at 391-92. The Court concluded that Rompilla was prejudiced by this failure because there was a reasonable probability that he would not have been sentenced to death had the jury heard this evidence. *Id*. at 393.

## Analysis

Petitioner contends that his trial counsel were ineffective for both failing to present mitigating evidence that they knew about and for failing to investigate other potentially mitigating evidence. Specifically, Petitioner contends that his attorneys should have placed into evidence the following evidence known to the attorneys: 1) Petitioner's records from a halfway house; 2) medical records from Petitioner's drug-induced car wreck that revealed a head injury; 3) testimony from a director of prisons in South Dakota that Petitioner had thirty-six minor infractions but was otherwise a good inmate; 4) Dr. Hopewell's impressions that Petitioner might have low average or borderline intellectual functioning and that he performed in an immature manner; and 5) a further explanation of the psychological evaluations conducted by the South Dakota Human Services Center that were

24

placed into evidence by the State. Furthermore, Petitioner asserts that his trial attorneys should have further investigated and presented the following evidence: 1) evidence from Petitioner himself of his childhood abuse and neglect and his continuous substance abuse problems; 2) Dr. Milam's diagnoses of permanent brain damage due to substance abuse and bipolar disorder; 3) evidence from Petitioner's birth mother that he witnessed her being abused by his father and evidence from his stepmother of his birth mother's poverty and neglect; 4) evidence from Petitioner of suspected sexual abuse; 5) evidence of Petitioner's educational history, including his learning problems and the fact that he was expelled in seventh grade for punching a teacher in the face; 6) evidence of Petitioner's extensive drug use, which began at age ten; and 7) evidence about a car crash Petitioner was in when he was young where his father, driving while intoxicated, crashed the car and caused head injuries to him and his son. (Pet. at 26-40).

*Failure to Present Evidence*

The State placed into evidence Petitioner's various records from the South Dakota prison system and attempted to place into evidence Petitioner's records from his two stints in a South Dakota halfway house, Glory House. (R. 45:150-53, R. 46:8-9). These records, which defense counsel acknowledged having before trial, contained information about Petitioner's previous criminal history, his previous psychological and psychiatric evaluations and the diagnoses he received, his personal history as recounted by him to various counselors and case workers, and his history of substance abuse and various unsuccessful treatment he entered for that. In his personal history, Petitioner had informed case workers and counselors that he had been in a foster home for a time, had difficulties with his stepmother and his brother, and had been abused by his father. (State's Ex. # 290, 291). Thus, while Petitioner tended to speak in generalities about any childhood

abuse in these records, defense counsel were aware of this history from these records. They knew that Petitioner previously had been diagnosed as having a mood disorder, an antisocial personality disorder, an organic mental disorder secondary to his dependence problems, and both alcohol and chemical dependence. (State's Ex. # 290, 291).

With regard to this information known by defense counsel at the time of trial, the record before this Court is that defense counsel made the strategic decision not to place evidence of Petitioner's history of substance abuse into evidence because they did not believe that it would be considered by the jury to be mitigating evidence. They also made the strategic decision not to call Dr. Hopewell as a witness to testify about his limited perceptions of Petitioner because this would, under Texas law, mean that the State would have the right to have Petitioner examined by its own expert. *See Lagrone v. State*, 942 S.W.2d 602 (Tex. Crim. App. 1997). If counsel has made an adequate investigation, any conscious and informed decision made based on trial tactics and strategy cannot be the basis for a claim of having received ineffective assistance of counsel unless the decision was so poorly chosen that it "permeates the entire trial with obvious unfairness." *Cotton v. Cockrell*, 343 F.3d 746, 753 (5th Cir. 2003) (quoting *United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002)). Given Petitioner's history of substance abuse, his numerous instances of violent and criminal behavior, and his lack of success at any of the treatment programs he entered, trial counsel's decision to abstain from introducing this information into evidence was not a poorly chosen decision that permeated the trial with unfairness. Likewise, counsels' decision not to present Dr. Hopewell's limited findings was not an unreasonable trial strategy.

With regard to defense counsel's decision not to present the information they had about Petitioner's history of abuse, via the Glory House records, Petitioner specifically instructed them

not to present such evidence, and "[g]reat deference must be given to choices which are made under the explicit direction of the client." *United States v. Masat*, 896 F.3d 88, 92 (5th Cir. 1990) (citing *Mulligan v. Kemp*, 771 F.2d 1436, 1441 (11th Cir. 1985), *cert. denied*, 480 U.S. 911 (1987)). Indeed, in *Strickland*, the Supreme Court stated that:

> [t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.

466 U.S. at 691. The information contained in the records counsel had at the time of trial indicated that Petitioner had self-reported that he had been abused by his father. At the time of his trial, Petitioner refused to allow counsel to present this evidence. Although the declaration from the mitigation specialist contains a hearsay statement from Petitioner that he did not speak of the abuse because he was ashamed and because counsel did not speak to him enough to allow him to open up, the record before this Court shows that the defense team spent a large amount of time with Petitioner unsuccessfully attempting to persuade him to allow them to present this evidence. However, Petitioner was adamant. Counsel did not provide constitutionally ineffective assistance by following Petitioner's request

With regard to Petitioner's assertion that his trial counsel were ineffective for failing to present medical records resulting from his car crash, testimony from a South Dakota director of prisons, and further explanation of the previous psychological evaluations done on Petitioner, Petitioner has failed to establish a reasonable probability that, had this evidence been presented, he would not have been sentenced to death. With regard to the car crash, defense counsel cross-examined the officer involved in the high-speed chase with Petitioner. The officer acknowledged

that Petitioner had to be rescued through the window of the car that was engulfed in flames. Petitioner was taken to the hospital with bleeding cuts and abrasions to his face. He had a head injury and broken limbs. (R. 45:78-84). Given that Petitioner had amphetamines on him at the time and caused the accident by attempting to elude the police, Petitioner has not shown that the introduction of such evidence would have had a mitigating value sufficient to change the result of the sentencing phase of the trial. Likewise, testimony from a director of prisons that Petitioner had **thirty-six** infractions while he was in prison, albeit minor ones, would not have been of great mitigating value, given that Petitioner later successfully escaped from the Hunt County jail. Petitioner has not shown how further explanation of psychological examinations that labeled Petitioner as a severe substance abuser with a mood and antisocial disorders would have been of mitigating value. In its order denying relief, the Court of Criminal Appeals held that counsel's decision not to present mitigating evidence was reasoned trial strategy. This conclusion is not contrary to federal law.

*Failure to Investigate Evidence*

Petitioner also contends that counsel were ineffective for not further investigating and presenting mitigating evidence. Looking at the additional evidence that Petitioner submitted here, the only evidence unknown to counsel consisted of the specific events that Petitioner's birth mother and stepmother recounted in their affidavits, more specific information about Petitioner's learning problems in school, an allegation of sexual abuse which Petitioner would not confirm, a car crash during Petitioner's childhood, and the psychological assessment that Dr. Milam made after testing and interviewing Petitioner.

Regarding the psychological assessment, counsel hired a psychologist who met with Petitioner. Even though counsel stressed to Petitioner the importance of the exam, Petitioner chose not to complete the tests he was given. During the state habeas process, Petitioner again declined to participate in a psychological exam. Although federal counsel have evidently been successful in convincing Petitioner belatedly to cooperate with a psychologist, his trial counsel cannot be considered ineffective for failing to develop a full psychological examination when their client chose to be uncooperative. Likewise, with regard to the car crash during Petitioner's childhood, the wreck occurred when his father was driving while intoxicated. This information would have had to come from Petitioner who was very loyal to his father, unwilling to speak badly of him, and adamant that no one else to do so. Counsel were not ineffective for not uncovering this evidence.

Concerning the information contained in the affidavits from Petitioner's birth mother and stepmother, the Court notes that Petitioner's birth mother speaks almost exclusively about abuse she received from Petitioner's father before Petitioner was three years old. Petitioner's stepmother speaks almost exclusively about how neglectful Petitioner's birth mother was before she lost custody. Neither of these affidavits thoroughly addresses Petitioner's upbringing, much less any abuse Petitioner received from either of them or from Petitioner's father. Accordingly, Petitioner has not shown a reasonable probability that, had evidence that Petitioner's father abused his birth mother (if Petitioner had allowed this evidence to be presented) and evidence that Petitioner was removed from her care at the age of three due to neglect (if Petitioner had permitted his stepmother to testify) been presented at trial, there is a reasonable probability he would not have been sentenced to death. Furthermore, Petitioner has not shown how evidence of suspected sexual abuse of

Petitioner could have been presented at trial when Petitioner would not speak about this either to his defense team at trial or to experts hired by federal habeas counsel.

Finally, Petitioner has not shown prejudice for defense counsel's failure to further investigate and present evidence of Petitioner's problems in school. First, Petitioner was the one who recounted that he was expelled from the seventh grade for punching a teacher in the face, after previously having been sent to various alternative education centers. This is not mitigating evidence. Although Petitioner presented evidence that he had some learning difficulties while he was in school, there is no evidence before this Court that Petitioner is mentally retarded or that these difficulties were of such a nature that, had they been presented at trial, a reasonable probability exists that Petitioner would not have been sentenced to death. This is so because along with this evidence would come evidence that Petitioner, after a long history of violent and criminal behavior, beat two men to death and then later escaped from jail by taking a female jailer hostage with the use of a homemade shank. In summary, trial counsel made the strategic decision not to present mitigating evidence at trial because Petitioner would not allow them to present evidence that he had been abused as a child and would not participate in a psychological exam. Additionally, they determined that evidence of Petitioner's long history of substance abuse was not of mitigating value to jurors in Hunt County, Texas. Given the position in which Petitioner himself placed his attorneys, Petitioner has not shown that this strategic decision was so ill-chosen that it rendered his trial unfair. Petitioner has pointed to additional evidence that he considers mitigating, such as evidence about car crashes, his life before age three, suspicions that he was sexually abused in a foster home, and his relatively good behavior in the South Dakota prison system. Nevertheless, Petitioner has either failed to show how this evidence could have been presented without Petitioner's cooperation or has failed to establish

a reasonable probability that, had this evidence been presented at trial along with the evidence presented by the State, Petitioner would not have been sentenced to death. Petitioner's sole ground for relief is without merit, and this Court recommends that it be denied.

## RECOMMENDATION

Petitioner failed to make a substantial showing of the denial of a federal right. Moreover, the state court adjudication on the merits on the claims presented to the state court neither resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Petitioner's petition for a writ of habeas corpus should be DENIED.

SIGNED and ENTERED this 13th day of August, 2008.

PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

The United States District Clerk shall serve a true copy of these findings, conclusions and recommendation on the parties. Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must serve and file written objections within ten days after being served with a copy. A party filing objections must specifically identify those findings, conclusions or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory or general objections. A party's failure to file such written objections to these proposed findings, conclusions and recommendation shall bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150, 106 S. Ct. 466, 472 (1985). Additionally, any failure to file written objections to the proposed findings, conclusions and recommendation within ten days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).